**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**AT BECKLEY**

UNITED STATES OF AMERICA

v.                                        CRIMINAL ACTION NO. 5:25-cr-00067

NATHANIEL WILBURN

### <u>MEMORANDUM OPINION AND ORDER</u>

Pending is Defendant Nathaniel Wilburn's Motion to Suppress, filed September 9, 2025. [ECF 24]. The Government responded on October 1, 2025. [ECF 32]. Mr. Wilburn replied on October 8, 2025. [ECF 33]. On October 22, 2025, the Court held an evidentiary hearing. [ECF 43]. Mr. Wilburn and Federal Public Defender Wesley P. Page appeared. Also present was Assistant United States Attorney Brian D. Parsons. The Court heard testimony from three witnesses, Corporal Shane Thompson ("Cpl. Thompson") with the West Virginia State Police, Sergeant Gary Epling ("Sgt. Epling") with the Raleigh County Sheriff's Office, and Defendant Nathaniel Wilburn.

The Court finds the law enforcement testimony was (1) internally consistent with immaterial exceptions, (2) confident without overstatement, (3) professional and neutral in tone, and (4) lacking in defensiveness or hostility. For these and other reasons, the Court finds both law enforcement officers to be entirely credible, especially insofar as it relates to the discovery of the drug paraphernalia. *See infra*.

Following the hearing, the Court directed the parties to file supplemental briefing. [ECF 48]. Mr. Wilburn filed his Supplemental Brief in Support of the Motion to Suppress Evidence

on November 4, 2025. [ECF 53]. The Government filed its response on November 10, 2025. [ECF 57]. The matter is ready for adjudication. The discussion that follows represents the Court's findings of fact and reasonable inferences arising therefrom, all made by a preponderance of the evidence.

## I.

Mr. Wilburn is charged with possessing firearms and ammunition while knowing he had been convicted of crimes punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). [ECF 1 ¶ 2]. Mr. Wilburn seeks to suppress "all evidence recovered from his home on October 31, 2024, at any time after 1:34 a.m. . . . as seized in violation of his Fourth Amendment rights." [ECF 24 at 2].

### A.    *Summary and Introduction of Material Events*

The summary that follows is designed to orient the reader amidst a very confusing timeline. A more granular and detailed version follows in the next section.

Officers seized the aforementioned evidence during and following a response to a CPR-in-progress, 911 call made from Mr. Wilburn's residence by his girlfriend and co-inhabitant close to midnight on October 30, 2024. [ECF 25 at 2–3; Ex. A at 8–9]. Law enforcement and emergency medical personnel arrived at the residence and found the subject three-year-old child unresponsive and exhibiting symptoms of a possible overdose. [ECF 25 at 2–3; ECF 32 at 5]. After the child was transported to the hospital, Cpl. Thompson re-entered the home to gather background information and investigate what caused the child's condition. [Ex. D1 at 00:07:31]. He asked Mr. Wilburn about controlled substances in the home. [Ex. J at 00:09:38]. Based on previous 911 calls

related to overdoses at the home, Cpl. Thompson suspected the child ingested controlled substances. [ECF 47 at 15:24–16:5; Ex. A at 7 ("Responding deputies indicated via radio traffic that they were familiar with the residence and had responded there for 'several overdoses.'")]. According to the search warrant application, the child was tragically pronounced dead at the hospital at 12:51 a.m. [ECF 24-2 at 10].

Cpl. Thompson, Sgt. Epling, and other officers remained at the scene gathering information about the child's condition and retrieving evidence, such as the child's feeding bag, well into the morning hours. [*See* Exs. D1–3, J]. Cpl. Thompson and the other officers entered and exited the home at various times during the hours they were present at the scene. [*Id.*]. As the investigation continued, both Mr. Wilburn and his family members who arrived at the scene informed the investigating officers of the child's underlying health conditions. [*Id.*; ECF 47 at 51:20–53:4]. At 1:34 a.m., Cpl. Thompson offered his condolences to Mr. Wilburn, exited the house, and turned off his body camera ("bodycam"). [Ex. D2 at 01:32:48–1:34:38]. Just four minutes later, however, at 1:38 a.m., Cpl. Thompson reenergized his bodycam and was seen standing inside the bathroom across from the child's room. [Ex. D3 at 01:37:58]. While in the bathroom, Cpl. Thompson recovered drug paraphernalia, some of which had been seen by Sgt. Epling prior to the child's passing. [*See* Ex. D3; ECF 47 at 58:23–59:9].

As noted, according to the officers' testimony, Sgt. Epling had earlier viewed the paraphernalia in plain view in the bathroom, and he later advised Cpl. Thompson of that fact when Cpl. Thompson discussed applying for a warrant. [ECF 47 at 13:7–14:4]. The Court infers as much in view of the entirety of the record and timeline. Sgt. Epling testified that upon his arrival at Mr. Wilburn's home, he went to look in the child's bedroom, check in with his deputies, and view the scene. [ECF 47 at 58:13–22]. After exiting the bedroom, Sgt. Epling testified:

> I then -- after I seen where he was laying at and that he had already left, like I said, I turned around. And as I was walking through -- I don't like -- check -- I don't like anything coming from behind me or anything like that. I'm just OCD like that. So I clicked on the bathroom light and I just looked in there and then I observed drug paraphernalia laying in the floor and in a waste paper basket.

[ECF 47 at 58:25–59:7]. Sgt. Epling testified that this discovery occurred around 12:35 a.m. [ECF 47 at 59:8–9]. His bodycam was not recording at the time. [ECF 47 at 61:7–9]. Other bodycam footage could be viewed as indicating the bathroom door appeared open with the light on prior to Sgt. Epling's exit of the child's bedroom, indicating he did not switch on the light. [*See* Exs. D1, J]. The Court does not treat that possible mis-recollection as material. Switching on the light would have been well within the parameters of the emergency-aid and, to the extent necessary, plain-view exceptions to the warrant requirement, all more fully discussed within.

When Cpl. Thompson later entered the bathroom at 1:38 a.m. to view the drug paraphernalia, to which Sgt. Epling alerted him after Cpl. Thompson had, as noted, walked out of the residence after conveying his condolences to Mr. Wilburn at 1:34 a.m., he found, among other things, two straws coated in white powder on the floor. [*See* Ex. D3 at 01:38:57–01:51:55]. As Cpl. Thompson stood in the bathroom, he also removed a hypodermic needle and a mirror coated in white powder from atop the medicine cabinet. [*Id.*]. He then asked Sgt. Epling about foil he had seen, and Sgt. Epling pointed Cpl. Thompson to the bathroom wastebasket. [*Id.* at 01:51:24–01:51:38]. This exchange aids in confirming Sgt. Epling did in fact see, at a minimum, the foil in plain view earlier that evening when he looked into the bathroom prior to the child being pronounced dead.

**B.** *Detailed Substantive Timeline of the Events*

As noted, the timeline in this matter is unfortunately a bit muddled. The Court has thus undertaken to carefully scrutinize the record as set forth more fully within, beginning with a more detailed timeline of the evening's events:

23:53:07: Cpl. Thompson's bodycam activates while he is in his vehicle approaching the scene. [Ex. D1].

23:54:22: Cpl. Thompson enters the home and walks to the back bedroom, passing by the bathroom, where the door is open and the light is on. [*Id.*].

00:03:09: Cpl. Thompson exits the home following the arrival of EMS, Sgt. Epling and other officers are standing by the ambulance. [*Id.*].

00:07:09: The ambulance leaves the premises with the child. [*Id.*].

00:07:30: Cpl. Thompson re-enters the home to speak with Mr. Wilburn. [*Id.*].

00:07:43: An unnamed Raleigh County Sheriff's Deputy ("RCSD") activates his bodycam in the kitchen of Mr. Wilburn's home [Ex. J].

00:08:16: RCSD stands next to Cpl. Thompson while Mr. Wilburn describes a timeline of events prior to the 911 call. [*Id.*].

00:09:09: Mr. Wilburn explains to Cpl. Thompson the child's health conditions and that he and his girlfriend, with whom he also shares children, were caring for the child because the child's parents are incarcerated. [*Id.*].

00:09:38: Cpl. Thompson asks about the possibility of any substances in the child's system, Mr. Wilburn says no and explains that the child was immobile, so he could not have accessed anything in the home on his own. [*Id.*].

00:10:58: Sgt. Epling heads down the hallway toward the back bedroom. [*Id.*].

00:11:19: RCSD walks toward the back bedroom, passing and shining his flashlight in an open room on his left. [*Id.*].

00:11:23: RCSD passes by the bathroom on his left. The light is on and the door is open. Another door is visibly ajar in front of him as he walks down the hallway and turns right to enter the child's bedroom. [*Id.*].

00:12:10: In the bedroom, RCSD discusses the child's relationship to Mr. Wilburn and Mr. Wilburn's girlfriend with two other officers. [*Id.*].

00:12:37: RCSD turns to face Sgt. Epling who is looking around the room and on the shelves in the bedroom. Multiple other officers are present in the hallway. [*Id.*].

00:13:28: The officers begin to exit the child's bedroom, and the bathroom door is open with the light on. [*Id.*].

00:13:36: Sgt. Epling looks to the right as he exits the child's bedroom and asks, "Who's room is that?" [*Id.*].

00:13:44: RCSD states "I have no idea. I'm not looking around there too much, they may want to get a search warrant" as Sgt. Epling steps out of camera view and RCSD turns to walk to the front of the house. [*Id.*].

00:13:55: RCSD turns around facing the back of the house again and Sgt. Epling is in view looking in another bedroom where the door had earlier been slightly ajar. He stays in the back part of the house with another officer.[1] [*Id.*].

00:14:00: RCSD returns to the front of the house where Cpl. Thompson and two other officers are still speaking with Mr. Wilburn. [*Id.*].

00:14:29: RCSD exits the home with two other officers. [*Id.*].

00:14:38: Cpl. Thompson exits the home. [Ex. D1].

00:14:59: Cpl. Thompson stands outside with at least four other officers discussing the preliminary information and background of events. [*Id.*].

00:15:06: Cpl. Thompson receives water to rinse his mouth because he had earlier administered CPR to the child. [*Id.*].

00:16:20: Cpl. Thompson discusses the provision of CPR, the child's medical history, and rinses his mouth. [*Id.*].

00:18:00: Cpl. Thompson reenters the home and continues asking Mr. Wilburn questions about the home and the evening's events. [*Id.*].

---

[1] It is at some point within the timeframe of this moment and 12:35 a.m. that Sgt. Epling discovered in plain view the suspected drug paraphernalia in the bathroom. The exact moment of his discovery within this short, 21-minute timeframe is inconsequential and does not call Sgt. Epling's testimony into question.

00:18:59: Cpl. Thompson asks Mr. Wilburn about the history of the home, explaining the deputies are familiar with the house. [*Id.*].

00:19:25: Mr. Wilburn explains that he has been in and out of jail and is on parole for two different charges. He cannot recall the exact charges. [*Id.*].

00:23:30: Mr. Wilburn explains a closed Child Protective Services ("CPS") investigation based on one of Mr. Wilburn's other children having carbon monoxide and amphetamines in his system. [*Id.*].

00:25:30: Another unnamed officer asks Mr. Wilburn about an overdose incident that occurred at the home the month prior. [*Id.*].

00:26:11: Mr. Wilburn explains that the overdose occurred in the driveway and the individual had been at the home to sell Mr. Wilburn tools. Mr. Wilburn says he keeps Narcan on hand. [*Id.*].

00:27:21: Cpl. Thompson asks another unnamed officer to call centralized intake (*i.e.*, CPS), considering the three other children in the home, and Mr. Wilburn becomes upset. [*Id.*].

00:29:00: Cpl. Thompson sits down on the couch with Mr. Wilburn to calm him down and gain further information. [*Id.*].

[00:51:00: While not depicted on the bodycam footage, according to the first search warrant application discussed within, the child is pronounced dead. [Ex. B at 10]]. By this point, as earlier noted, Sgt. Epling had already viewed the suspected drug paraphernalia in the subject bathroom.

00:51:04: Cpl. Thompson concludes his conversation with Mr. Wilburn, tells Mr. Wilburn he is going to leave, and gives him one of his business cards. [Ex. D1].

00:51:16: Cpl. Thompson tells Mr. Wilburn he is going to take some photographs of the bedroom. [*Id.*].

00:52:16: Without having gone back to the bedroom, Cpl. Thompson exits Mr. Wilburn's home with other officers and turns his bodycam off. [*Id.*].

01:12:24: Cpl. Thompson's bodycam reactivates and he is standing in the driveway of Mr. Wilburn's home talking to Mr. Wilburn's grandmother. [Ex. D2].

01:19:28: Cpl. Thompson ends his conversation with Mr. Wilburn's grandmother to re-enter the house and talk to Mr. Wilburn. [*Id.*].

01:19:50: Cpl. Thompson enters the home after knocking but not waiting for an answer. [*Id.*].

01:19:56: Cpl. Thompson asks Mr. Wilburn if his grandmother can enter the home, and where the feeding kit is. Cpl. Thompson walks to the back bedroom. [*Id.*].

01:21:23: Mr. Wilburn's grandmother walks to the back bedroom after Cpl. Thompson. [*Id.*].

01:25:23: Mr. Wilburn's mother arrives in the back hallway to talk to Cpl. Thompson as Cpl. Thompson examines the feeding apparatus. [*Id.*].

01:25:45: Mr. Wilburn's mother talks to Cpl. Thompson and shares information about the child and his health conditions. [*Id.*].

01:26:57: Mr. Wilburn's father arrives to discuss the situation and instructs Cpl. Thompson how to retrieve the feeding bag. [*Id.*].

01:32:27: Cpl. Thompson exits the bedroom and walks to the front of the house. [*Id.*].

01:32:48: Cpl. Thompson informs Mr. Wilburn he is seizing the feeding bag to test it, extends his condolences, gives him his contact information, and says goodbye to Mr. Wilburn and the other children. [*Id.*].

01:34:38: Cpl. Thompson exits the home and turns off his bodycam. [*Id.*].

01:37:58: Just three minutes and twenty seconds later, however, Cpl. Thompson's bodycam reactivates as he is entering the bathroom. [Ex. D3].

01:38:57: Cpl. Thompson views a straw coated in white powder on the floor, picks it up and asks Mr. Wilburn what it is. [*Id.*].

01:39:10: Mr. Wilburn enters the bathroom to discuss the straw with Cpl. Thompson. [*Id.*].

01:42:20: Cpl. Thompson and Mr. Wilburn remain in the bathroom, and Cpl. Thompson picks up another straw from the floor. [*Id.*].

01:43:17: Cpl. Thompson opens the medicine cabinet and quickly closes it. [*Id.*].

01:43:27: Mr. Wilburn reaches towards the medicine cabinet for pain relievers. [*Id.*].

01:43:39: Cpl. Thompson picks up a hypodermic needle from atop the medicine cabinet and asks Mr. Wilburn about it. [*Id.*].

01:46:35: Cpl. Thompson places the drug paraphernalia in an evidence bag, seizing it. [*Id.*].

01:47:09: Cpl. Thompson asks Mr. Wilburn, still in the bathroom, if he has a place he and the children can go if they have to search the house. [*Id.*].

01:47:29: Cpl. Thompson pulls a small mirror with white powder off the top shelf of the medicine cabinet. [*Id.*].

01:49:12: Cpl. Thompson and Mr. Wilburn remain in the bathroom as Cpl. Thompson communicates with colleagues on his phone regarding the drug paraphernalia. [*Id.*].

01:50:41: Cpl. Thompson and another officer begin discussing the retrieval of a search warrant. [*Id.*].

01:51:24: Cpl. Thompson asks Sgt. Epling where he saw the foil in the bathroom. [*Id.*].

01:51:36: Cpl. Thompson reaches into the bathroom trashcan to retrieve a 7-up can with foil in it. [*Id.*].

01:51:55: Cpl. Thompson informs Mr. Wilburn everyone will have to leave the home. [*Id.*].

1:52:10: Cpl. Thompson and other officers walk to the front of the home to discuss securing the premises. [*Id.*].

01:54:38: Cpl. Thompson walks back to the bathroom to describe the paraphernalia he seized to someone he is speaking to on the phone. [*Id.*].

01:55:26: Cpl. Thompson leaves the bathroom again. [*Id.*].

01:55:45: Mr. Wilburn asks if there were drugs found in the child's system and asks why the officers are seeking a warrant. [*Id.*].

01:57:06: Cpl. Thompson explains that the officers will secure the home and seek a search warrant to determine whether anything may have contributed to his death. [*Id.*].

01:59:52: Cpl. Thompson exits Mr. Wilburn's home. [*Id.*].

02:00:00: Cpl. Thompson turns off his bodycam. [*Id.*].

Following the seizure of the drug paraphernalia, Cpl. Thompson applied for a search warrant for evidence of child neglect resulting in death. [ECF 47 at 47:15–20; Ex. B]. The first search warrant issued at 3:49 a.m. on October 31, 2024. [Ex. B at 3]. During the execution of the first warrant, the officers discovered firearms in the home. [Ex. C at 12]. After earlier learning that Mr. Wilburn was a prohibited person, Cpl. Thompson sought a second search warrant for more firearms. [Ex. C]. Upon issuance of the second warrant at 5:50 a.m. on October 31, 2024, [*id.* at 4], Cpl. Thompson discovered other firearms and ammunition. [ECF 47 at 53:15–54:1].

Mr. Wilburn now seeks to suppress all evidence uncovered by both search warrants. [ECF 24; ECF 25]. He asserts the officers were not legally in his home after the child left for the hospital, much less after the child was pronounced dead at 12:51 a.m. [ECF 53 at 8]. Furthermore, he contends Cpl. Thompson's reentry at approximately 1:38 a.m. was an illegal search because the bathroom door was closed and Mr. Wilburn had not consented to the reentry. [ECF 24 at 8–13]. Accordingly, he contends all the evidence uncovered during the execution of the search warrants is likewise the result of an illegal search. [*Id.* at 7]. Finally, Mr. Wilburn moves for a *Franks* hearing, alleging that Cpl. Thompson knowingly and intentionally misrepresented facts in the search warrant application.

## II.

### A.    *The Fourth Amendment Privilege*

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Brinkley*, 980 F.3d 377, 383 (4th Cir. 2020) (quoting U.S. Const. amend. IV.). The oft-quoted constitutional command has become so familiar that some take it for granted. The Founders did

not. Ironically, many of them drew their inspiration for the principle espoused in the Fourth Amendment from a speech given in the House of Commons in 1763.

At that time, William Pitt, the First Earl of Chatham -- counted as one of the all-time great British prime ministers -- stated this:

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail -- its roof may shake -- the wind may blow through it -- the storm may enter -- the rain may enter -- but the King of England cannot enter! -- all his force dares not cross the threshold of the ruined tenement!

William Pitt, Earl of Chatham, Speech (Mar. 1763), *in* 1 Henry Lord Brougham, F.R.S., Historical Sketches of Statesmen Who Flourished in the Time of George III 42 (2d ed. 1839).

The Fourth Amendment privilege is thus one of the most treasured elements of the Bill of Rights, with a command so stern that, "[i]n most cases, a search or seizure is unreasonable unless authorized by a warrant." *Brinkley*, 980 F.3d at 383. Unsurprisingly, based upon its original inspiration for protecting an abode from governmental intrusion, "[t]he warrant requirement carries special force when police seek to enter a private home, which is 'afforded the most stringent Fourth Amendment protection.'" *Id*. (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976)). "'With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.'" *Id*. at 383–84 (quoting *Kyllo v. United States*, 533 U.S. 27, 31 (2001)).

**B.    *Exceptions to the Warrant Requirement***

### 1. The Emergency Aid Exception

One permissible deviation from the search warrant requirement is the "emergency aid" exception. *Kentucky v. King*, 563 U.S. 452, 460 (2011) (recognizing "officers may enter a

home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). A similar exception, namely, for exigent circumstances, is a bit broader. For example, "[a]n officer may enter the home if 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *United States v. Taylor*, 624 F.3d 626, 631 (4th Cir. 2010) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)).

"Whatever the terminology used, under this approach, to determine whether a given emergency justifies officers bypassing a Fourth Amendment protection, courts look to officers' 'objectively reasonable belief . . . based on specific articulable facts and reasonable inferences that could have been drawn therefrom.'" *United States v. Curry*, 965 F.3d 313, 322 (4th Cir. 2020), *as amended* (July 15, 2020), *as amended* (July 16, 2020) (quoting *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013) (citing *Michigan v. Fisher*, 558 U.S. 45, 47 (2009))). "[A]ny search following warrantless entry for emergency reasons . . . must then be limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." *Taylor*, 624 F.3d at 633 (quoting *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)).

## 2. Plain View Exception

Law enforcement officers may seize an object in plain view without a warrant if "(1) the officer was lawfully in a place from which the object could be viewed; (2) the officer had a lawful right of access to the seized item; and (3) the incriminating character of the item was immediately apparent." *United States v. Green*, 106 F.4th 368, 377 (4th Cir. 2024) (cleaned up). The incriminating nature of an object is immediately apparent if, under the circumstances, an

officer has probable cause to believe that the object contains or constitutes evidence of a crime. *United States v. Davis*, 94 F.4th 310, 319 (4th Cir. 2024) (citing *United States v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017) ("Seizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence.")). If an officer is lawfully in a particular place, a minor detour is permitted to get a better look at the evidence. *United States v. Jackson*, 131 F.3d 1105, 1110 (4th Cir. 1997) ("A search compromising the individual's interest in privacy must be unreasonable to implicate the Fourth Amendment.").

### 3. Consent Exception

Consent to search is valid "if it is (1) knowing and voluntary, and (2) given by one with authority to consent." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (internal citations omitted). The determination of whether consent was freely and voluntarily given hinges upon the totality of the surrounding circumstances. *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). Relevant considerations include "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *Id.* "Whether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent, although the Government need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary." *Id.*; *United States v. Gordon*, 895 F.2d 932, 938 (4th Cir. 1990).

## C.    *Analysis*

### 1. Alleged Fourth Amendment Violation

It is uncontested that the officers' initial entry to Mr. Wilburn's home was valid under the emergency aid exception inasmuch as the officers arrived in response to a 911 call from the residents of the home, namely, Mr. Wilburn and his girlfriend, and CPR in progress on a child. It was Mr. Wilburn who searched for the phone to call 911.

Mr. Wilburn asserts, however, the emergency aid exception evaporated upon the child leaving for the hospital. [ECF 53 at 8]. The Government contends the exception continued unabated, and Cpl. Thompson's return to the bathroom was "reasonable and prudent." [ECF 57 at 3]. The Government is unquestionably correct, at least up to the moment law enforcement learned the child was pronounced dead.

This is so inasmuch as it was objectively reasonable for Cpl. Thompson and the officers to (1) remain in the house, and (2) search for evidence that may have contributed to the child's medical emergency. *Taylor*, 624 F.3d at 631; *Curry*, 965 F.3d at 322. Cpl. Thompson testified he was investigating possible causes of the child's harm based upon (1) information he received about the home, (2) knowledge he had about the child's symptoms, and (3) his accumulated experience from similar circumstances. [ECF 47 at 6:22–12:19]. Inasmuch as the child's symptoms aligned with those of a potential drug overdose, Cpl. Thompson sought information that may have been helpful to "relay to the doctors who would be working on the child" and perhaps save a fast-deteriorating life. [*Id.* at 7:5–12].

To round out the timeline a bit further, when Cpl. Thompson arrived at 11:53 p.m., he promptly began administering CPR. [Ex. A at 7]. A few minutes later, EMS personnel arrived on scene. [*Id.*]. The child was transported to the hospital at about 12:07 a.m. -- less than 20 minutes

14

after Cpl. Thompson first arrived. [ECF 47 at 25:11–13; Ex. D1 at 00:07:09]. Based on the ongoing resuscitation efforts, Cpl. Thompson and the other responding officers could not have reasonably gained sufficient information about the emergency during the initial moments following their arrival at the scene. It was thus objectively reasonable for Cpl. Thompson to have stayed in the home after the child was transported in order to gather information from the present adults. In other words, the emergency did not abate upon the child departing for the hospital. It continued well after, given law enforcement's objectively reasonable desire to surface and relay to medical professionals what might be causing the child's life-threatening condition.

The emergency was ongoing when Sgt. Epling entered the home and walked to the back of the house to investigate the circumstances. [Ex. J at 00:10:53]. Again, the critical minutes following the child's transport to the hospital may have led to a lifesaving discovery for the child. The officers' search of the premises was reasonably circumscribed, given the symptoms the child presented. Looking around on shelves and open areas, especially in the child's bedroom, for anything that might have provided insight into the cause of his distress, fits comfortably within the emergency aid exception. It was also reasonable to view an open bathroom positioned across from the child's room for signs of anything that might have contributed to the child's harm.

To revisit the hearing testimony, Sgt. Epling first saw the drug paraphernalia in plain view during these initial minutes following the child's transport to the hospital. [ECF 47 at 58:23–59:7]. His discovery therein was thus within the time frame encompassed by the emergency aid exception. In describing his discovery of the drug paraphernalia in the bathroom, Sgt. Epling testified that he arrived at Mr. Wilburn's home at approximately 12:06 a.m. [*Id.* at 58:3–12]. Upon his arrival, he testified he went to the back bedroom to see where the child had been. [*Id.* at 58:13–59:7]. After leaving the bedroom, he testified that he looked into the bathroom and turned on the

light and then he saw the drug paraphernalia in plain view. [*Id.* at 58:23–59:7]. He testified that he made this observation around 12:35 a.m. [*Id.* at 59:8–9], prior to the time law enforcement was notified of the child's passing. He later testified that he did not recall but believed the bathroom door was open when he entered and viewed the drug paraphernalia. [*Id.* at 63:1–3]. Given the fact the door was open at various times according to the bodycam footage, the Court finds the door was indeed open at this point. This finding arises logically from the bodycam footage.

The bodycam footage included in the record does not include Sgt. Epling's discovery of the drug paraphernalia or his entry into the bathroom, inasmuch as Sgt. Epling testified his bodycam was not recording at that time. [*Id.* at 61:7–9]. The bodycam footage admitted into evidence, however, shows that the bathroom light was on and the door open prior to Sgt. Epling's arrival at Mr. Wilburn's home. [Ex. D1 at 23:54:22]. It is unclear whether the door remained open with the light on when Sgt. Epling arrived and walked towards the back bedroom, but less than a minute after he is viewed walking towards the back bedroom, another Raleigh County Sheriff's Deputy passes by the bathroom, and the light is on with the door open. [Ex. J at 00:11:23]. At that point, Sgt. Epling was already in the child's bedroom looking around and talking to other deputies.

When Sgt. Epling exits the child's bedroom with the other deputies, the bathroom light is on and the door is open. [Ex. J at 00:13:30]. Thus, the bodycam footage might be seen as contradicting Sgt. Epling's testimony about how he entered the bathroom. That is of no moment. Frankly, if Sgt. Epling did mis-recollect anything about the door to the bathroom and the light, it was perfectly reasonable for him under the circumstances to open the door, energize the light, and attempt to ascertain whether any cause of the child's distress might lie within.

As noted, the first search warrant stated the child was pronounced dead at 12:51 a.m. [Ex. B at 10]. Bodycam footage from Cpl. Thompson's entry into the bathroom confirms that Sgt. Epling had earlier viewed the drug paraphernalia. [Ex. D3 at 1:51:24]. This is so inasmuch as when Cpl. Thompson is in the bathroom, he asks Sgt. Epling where he had seen the foil, which was suspected drug paraphernalia, and Sgt. Epling points him to the trashcan next to the toilet. [*Id.*]. Clearly, Sgt. Epling had earlier viewed the drug paraphernalia and, consistent with his testimony, he notified Cpl. Thompson at this later point of the discovery and directed him to where he viewed it in the bathroom. [ECF 47 at 58:23–59:24].

Given the circumstances, Sgt. Epling's emergency-based, plain-view observation of the bathroom was objectively reasonable. He arrived just minutes after the child had been transported to the hospital and was among many officers present that evening seeking to assist in finding any possible causes of the child's medical distress. The circumstances warranted the support of multiple officers. Sgt. Epling was investigating the back bedroom area while Cpl. Thompson gained critical information from Mr. Wilburn.

As noted, Mr. Wilburn makes much of the reentry by Cpl. Thompson into his home after Cpl. Thompson expressed his condolences and departed at 1:34 a.m. He asserts that every reentry after the child was transported to the hospital happened without consent. [*See* ECF 53 at 9, 15]. As earlier noted, any reentry and search up to the child's passing is covered by the emergency aid exception.

The emergency aid and plain view exceptions are not, however, the only Fourth Amendment exceptions applicable. Law enforcement was summoned to the home by an authorized resident, with the knowledge and participation of Mr. Wilburn. Furthermore, it would be nonsensical to conclude the 911 call only authorized law enforcement to stay outside the home

given the life-threatening emergency unfolding within. No authorized occupant, including Mr. Wilburn, objected to Cpl. Thompson entering, administering CPR to the child, and looking around the home.

Thereafter, from 12:18 to 12:52 a.m., Cpl. Thompson was in the living room with Mr. Wilburn freely discussing the incident and seeking information about the child and the home. [Ex. D1]. At 12:52 a.m. Cpl. Thompson departed but reentered 27 minutes later, around 1:19 a.m., after the child was pronounced dead at the hospital. He did not barge in and begin a wide-ranging search. Indeed, he asked Mr. Wilburn upon reentry, "Where is his uh, [the Child's], feeding stuff, the setup -- is it in the room back here?" [Ex. D2 at 01:19:58], and Mr. Wilburn replied "uh-huh." [*Id.* at 01:20:04]. Under the circumstances, it was objectively reasonable for Cpl. Thompson to treat Mr. Wilburn's verbal confirmation as either a separate consensual entry and search or -- more likely -- a continuation of the original consensual entry for CPR, treatment, and necessary investigative efforts that was never withdrawn. This is especially so given Mr. Wilburn neither moved from the couch nor indicated any concerns respecting Cpl. Thompson's subsequent entry into the house or the journey to the back bedroom to find and retrieve the child's feeding materials.

Mr. Wilburn clearly consented to the officers' entry into his house and never contends that he explicitly revoked this consent. Nor is there any bodycam footage showing a revocation of consent when Cpl. Thompson exited the home at 1:34 a.m. Accordingly, when Cpl. Thompson reentered the home to view the suspected drug paraphernalia at 1:38 a.m. -- paraphernalia already lawfully discovered during the period covered by the emergency aid exception at a minimum -- he objectively concluded he was lawfully within the home and authorized to search. He certainly was not required to leave behind contraband earlier discovered by law enforcement during their lawful presence in the home.

18

It is thus apparent Cpl. Thompson was legally present in Mr. Wilburn's house from at least 11:53 p.m. until approximately 2:00 a.m. [Exs. D1–3, J]. Over the course of almost two hours, then, Cpl. Thompson entered and exited the home, moved about Mr. Wilburn's home freely, and had extensive conversations with Mr. Wilburn and multiple family members. Those conversations focused solely on the child and the circumstances leading up to and surrounding the 911 call. [*See* Exs. D1, D2, J]. It is of little moment that Cpl. Thompson also professed within the time frame he was leaving the house, something he did multiple times over the course of the evening.

One might offer speculative scenarios putatively undermining the aforementioned findings. For example -- now over a year removed from that night's crisis, in the calm and peace of the courtroom -- a skeptic might suggest Sgt. Epling would have immediately notified Cpl. Thompson of the paraphernalia discovery when it occurred. That ideal scenario is incompatible with the events unfolding at high speed that evening and morning. The very stressful and demanding circumstances then occurring involved (1) Cpl. Thompson attempting resuscitative efforts on the child, (2) multiple law enforcement officers entering and leaving the residence, (3) Cpl. Thompson interacting at great length with the child's grief-stricken guardian and family members while performing an ongoing assessment of the house and the circumstances, and much more. It is thus unsurprising that the suspected drug paraphernalia was not earlier acted upon. The unfortunate timing may simply have been the result of Sgt. Epling allowing Cpl. Thompson's questioning and interaction with Mr. Wilburn to conclude. That primary investigative effort was clearly the most important one taking place that evening and even the slightest interruption may have derailed it. And a child's life was at stake. Foremost, as noted, although Cpl. Thompson

19

announced his condolences and exit, there is nothing in the record to indicate Mr. Wilburn gave him any reason to believe he was no longer permitted in the house.

The Court thus concludes that Mr. Wilburn -- throughout the entirety of his encounter with law enforcement -- consented to the officers' presence and investigation, including the entry into the bathroom that resulted in the removal of the suspected drug paraphernalia and controlled substances.

## 2. Application of the Exclusionary Rule

Assuming a violation of the warrant requirement occurred, the Court would inquire respecting the remedy, if any. The usual remedy in such a situation is application of the exclusionary rule. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *see United States v. Jones*, 678 F.3d 293, 305 n. 7 (4th Cir. 2012); *United States v. Doyle*, 650 F.3d 460, 466–67 (4th Cir. 2011) ("Ordinarily, when a search violates the Fourth Amendment, the fruits thereof are inadmissible under the exclusionary rule, 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974))).

Some harbor the mistaken notion that suppression follows ineluctably from a Fourth Amendment violation. That is not the law. Suppression is "not a personal constitutional right," nor contemplated as "redress" for the constitutional wrong done. *Stone v. Powell*, 428 U.S. 465, 486 (1976). It is instead focused on deterrence, namely, preventing future Fourth Amendment violations. The Supreme Court has said this:

> Real deterrent value is a "necessary condition for exclusion," but it is not "a sufficient" one. *Hudson v. Michigan*, 547 U.S. 586, 596, 126 S. Ct. 2159, 165 L.Ed.2d 56 (2006). The analysis must also account for the "substantial social costs" generated by the rule. *Leon*, *supra*, at 907, 104 S.Ct. 3405. Exclusion exacts a heavy

20

toll on both the judicial system and society at large. *Stone*, 428 U.S., at 490–491, 96 S. Ct. 3037. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. *Ibid*. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. *See Herring*, *supra*, at 141, 129 S.Ct. 695. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." *Hudson*, *supra*, at 591, 126 S.Ct. 2159. *For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs*. *See Herring*, *supra*, at 141, 129 S.Ct. 695; *Leon*, *supra*, at 910, 104 S.Ct. 3405.

*Davis v. United States*, 564 U.S. 229, 237 (2011) (emphasis added) ("Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'") (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)). Indeed, in *Davis*, the High Court refused exclusion inasmuch as "[t]he officers who conducted the search did not violate Davis' Fourth Amendment rights deliberately, recklessly, or with gross negligence" nor did the "case involve any 'recurring or systemic negligence' on the part of law enforcement." *Id.* at 240–241 ("We have stated before, and we reaffirm today, that the harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity.'").

It is difficult to imagine a scenario less likely to serve a deterrent or legitimately punitive purpose justifying exclusion. That evening, (1) law enforcement was summoned to the home, (2) they provided emergency medical assistance to a critically ill child, including the administration of CPR resulting in the child expelling bile into Cpl. Thompson's mouth, (3) law enforcement immediately transitioned to their investigative roles following the child being transported to the hospital, knowing that investigation might save the child, (4) the officers then learned their lifesaving efforts failed upon being notified the child had died, (5) until that moment, they had engaged in the urgent task of attempting to learn what caused the child's distress, all the while dealing with the grief-stricken occupant who helped summon them, namely, Mr. Wilburn, (6) they were required to interact not just with Mr. Wilburn but also with other emotionally

distressed family members and other children present in the home, (7) they had prior familiarity with the residence and prior drug-related incidents associated with it, which formed part of the contextual background informing their on-scene assessment, (8) all of this transpired into the early morning hours, and (9) the necessary entries into and exits from the residence complicated their objective understanding of the scope and basis of their authority at any given moment. And, in addition to all of this, Mr. Wilburn never uttered any objection whatsoever to their comings and goings into the home and their departures with critical evidence.

Based upon the foregoing, and assuming a Fourth Amendment violation occurred somewhere along this torturous, twisting, and winding journey through the night, the harsh medicine of the exclusionary rule is wholly unjustified.

### 3. *Franks* Hearing

"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 156 (1978). The *Franks* test is two-pronged. *Id.* First, the defendant "must prove that the affiant here made misrepresentations in or omitted information from the affidavit 'with reckless disregard of whether it would make the affidavit misleading.'" *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021) (quoting *United States v. Lull*, 824 F.3d 109, 115 (4th Cir. 2016)). The burden of proof here is high, "because an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Id.* at 377. "Allegations of negligence or innocent mistake are insufficient." *Id.*

Second, the defendant must show that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Lull*, 824 F.3d at 114 (quoting *Franks*, 438 U.S. at 156). This test applies both when "an agent includes affirmatively false statements in a warrant affidavit" and "when an agent *omits* relevant facts from the affidavit." *Id.* When an officer makes an omission, our Court of Appeals has held that the Fourth Amendment is violated only when the affiant omitted "material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *Id.* at 115 (quoting *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)).

Mr. Wilburn offers several contentions he believes justify a *Franks* hearing. First, he notes the paragraph in the search warrant discussing his criminal history and the history of CPS involvement at the home. [ECF 53 at 19]. Second, he contends that Cpl. Thompson lied about how he discovered the drugs in the bathroom. [*Id*. at 20]. Third, Mr. Wilburn asserts the inclusion of the 911 call history was misleading and omitted information that would have undermined the probable cause determination. [*Id*. at 21]. Finally, Mr. Wilburn asserts that Cpl. Thompson's failure to include details about the child's severe health conditions undermined the probable cause determination. [*Id*.].

Many of the underlying arguments hinge upon linguistics and explanatory frameworks that cut both for and against Cpl. Thompson's challenged statements. For example, Mr. Wilburn contends Cpl. Thompson's recitation of the 911 call history was misleading inasmuch as it omitted details undermining probable cause. He seizes upon Cpl. Thompson stating an overdose incident occurred in the home when, in fact, it occurred in the driveway. Simply put, the driveway is part of the premises; that distinction matters not. An overdose in the home's driveway

is no less relevant to probable cause than one inside the home. The omission therefore does not amount to "reckless disregard" for the truth.

The same is true of the remaining assertedly false or reckless statements. None of them were made knowingly, intentionally, or with reckless disregard for the truth. A *Franks* hearing is thus unnecessary and unwarranted.

**III.**

For the foregoing reasons, Mr. Wilburn's Motion to Suppress [**ECF 24**] is **DENIED**.

The Clerk is **DIRECTED** to send a copy of this written opinion and order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER:        January 22, 2026

Frank W. Volk
Chief United States District Judge